## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CORNELL HURLEY, JR.,

      Petitioner,

      v.                                      CASE NO.  21-3114-JWL

(FNU) JOHNSTON, Colonel,
USDB-Leavenworth,

      Respondent.


## MEMORANDUM AND ORDER

This matter is a petition for habeas corpus filed under 28 U.S.C. § 2241.  Petitioner is confined at the United States Disciplinary Barracks at Fort Leavenworth, Kansas.  Petitioner challenges his disciplinary proceedings before the Discipline and Adjustment ("D&A") Board. The Court finds that Petitioner does not allege facts establishing a federal constitutional violation and denies relief.

## I.  Background

Petitioner is a former active duty member of the United States Army.  Petitioner was sentenced after a general court-martial and is an inmate at the United States Disciplinary Barracks ("USDB") at Fort Leavenworth, Kansas.

On September 17, 2018, and March 2, 2021, two separate three-member D&A Boards within the USDB found Petitioner guilty, contrary to his pleas, of disorderly conduct and possession of prohibited property, respectively.[1] (Doc. 6–3, Declaration of Nikki Gessner ("Gessner Decl.")  ¶¶ 9, 27; Exhs. 8, 17).  The first Board recommended recreation restriction

---

[1] D&A Boards are administrative hearings conducted inside the USDB to evaluate alleged prisoner violations of institutional rules, and if substantiated, to recommend appropriate discipline. Gessner Decl. ¶ 3.

not to exceed twenty-eight days. *Id*. at ¶ 12; Exh. 8. The second Board recommended a reprimand and recreation restriction not to exceed thirty days. *Id*. at ¶ 27; Exh. 17.

On September 24, 2018, the Board's recommendations regarding Petitioner's first D&A Board were approved by the USDB Deputy Commandant. *Id*. at ¶ 13; Exh. 8. On September 27, 2018, Petitioner received a copy of the D&A Board results, along with notification that he was not eligible to appeal because his recommended punishment did not include disciplinary segregation, custody reduction, or forfeiture of abatement to confinement. *Id*. Petitioner signed the Board record acknowledging receipt and marked the form indicating his intent to appeal. [2]

On March 10, 2021, the Board's recommendations regarding Petitioner's second D&A Board were approved by the USDB Deputy Commandant. *Id*. at ¶ 28; Exh. 17. On March 16, 2021, Petitioner received a copy of the Board results, along with notification that he was not eligible to appeal because his recommended punishment did not include disciplinary segregation, custody reduction, or forfeiture of abatement to confinement. *Id*. Petitioner signed the Board record acknowledging receipt and marked the form indicating his intent to appeal. *Id*.

On May 3, 2021, Petitioner filed the instant Petition under 28 U.S.C. § 2241, raising the following grounds:

(1) "The disciplinary and adjustment board members violated my due process rights under the 5th Amendment to the Constitution when they failed to properly charge me, notify me of the charge, allow me to marshal the facts and prepare a defense against an erroneous charge given to me at the disciplinary board." (Doc. 7, at 6.)

---

[2] Petitioner appealed his first D&A Board decision on October 10, 2018. Although he was not entitled by regulation to appeal based on the recommended punishment, the USDB Office of the Command Judge Advocate ("OCJA") nonetheless permitted the appeal as an extra measure of due process. (Doc. 6–4, Declaration of Stephen Harms ("Harms Decl.") ¶ 6; Exh. 1.) That appeal was denied by the Commandant and served upon Petitioner. *Id*.; Exh. 2. No additional appeals are authorized by regulation. *Id*. Petitioner appealed his second D&A Board decision on March 9, 2021. The OCJA responded on behalf of the Deputy Commandant and notified Petitioner that he was not entitled to appeal based on the recommended sentence. *Id*. ¶ 8; Exh. 3. There are no additional appeals authorized by Army regulation or policy. *Id*.

(2) "The disciplinary and adjustment board members abused their discretion by adding a charge without prior notification." *Id.*

(3) "The disciplinary and adjustment board did not call a key witness to the board proceedings." *Id.*

(4) "The disciplinary and adjustment board violated my rights to due process by not allowing me to have copies of the evidence in a timely manner in order to consult with an attorney and also by having me hand write the evidence against me within a ten minute period." *Id.* at 7.

Petitioner alleges due process violations in connection with his disciplinary proceedings before the D&A Boards and seeks to have the Boards' recommendations set aside and to have any references to the charges expunged from his CTF (Correctional Treatment File). *Id.*

## II.  Facts

### A. Petitioner's September 17, 2018 D&A Board

On May 17, 2018, a disciplinary report and charge sheet were initiated against Petitioner for assault consummated by battery.  Gessner Decl. ¶ 4; Exhs. 4, 5.  According to the disciplinary report, Petitioner was involved in a fight with another inmate.  *Id.*  A facility soldier assigned to the post witnessed the incident, waved down additional staff members, and separated the inmates.  *Id.*  Petitioner was assessed by the duty medic, but sustained no injuries. *Id.*

On May 18, 2018, military police investigator Megan Cooney conducted further investigation. *Id.* at ¶ 5; Exh. 4. According to her report, she reviewed the closed-circuit television ("CCTV") video surveillance footage from the area where Petitioner's alleged fight occurred the previous day.  *Id.*  The CCTV footage was recorded, placed onto a "disk," and attached to the case file available for the D&A Board to review.  *Id.*  That same day, military

police investigator Robert Camden invited Petitioner to discuss the incident, but Petitioner declined. *Id*. After reviewing the case file, military police "titled" Petitioner with assault consummated by battery. *Id*.

Under Army Corrections Command ("ACC") Policy Letter #8, *Institutional Offense Policy* (Aug. 15, 2017), assault consummated by battery is defined as "[t]o intentionally and without consent, strike, touch, or apply force to the person of another, either directly or indirectly, resulting in either bodily harm or an offensive touching of any form."[3] *Id*. at ¶ 6; Exh. 3, ACC Policy Letter #8 ¶ 4.f.

On September 10, 2018, Petitioner was provided a formal statement of charges for assault consummated by battery. *Id*. at ¶ 7; Exh. 6. Petitioner signed the statement acknowledging that he read the charge and received a copy of the same. *Id*. Petitioner was also provided written notification that a three-member D&A Board would be convened to adjudicate the charge against him. *Id*.; Exh. 7. Petitioner was notified that he had the right to be present during all open sessions; make a statement and present documentary evidence in his defense; call witnesses to present relevant testimony in his defense; and question adverse witnesses through the Board President. *Id*. Petitioner signed the notification acknowledging receipt. *Id*.

On September 17, 2018, the three-member D&A Board convened and conducted a hearing into the charge. *Id*. at ¶ 8; Exh. 8. Petitioner was present for the hearing; informed of the alleged misconduct; sworn under oath; made aware of his rights; informed of his right to question relevant witnesses; and given the opportunity to present evidence in his defense. *Id*.;

---

[3] ACC Policy Letter #8 "lists and describes offenses under which a prisoner may receive administrative disciplinary action." Gessner Decl. ¶ 3; Exh. 3, ACC Policy Letter #8 ¶ 4. It cautions that "[f]acility commanders can impose administrative disciplinary measures to ensure compliance with rules and regulations of the facility . . . ." *Id*. ¶ 2. Further, it confirms that "[a]ll newly assigned prisoners will be briefed on facility rules and regulations, UCMJ, and administrative disciplinary measures . . ." and that "[a]ll prisoners . . . will be required to become familiar with the rules and procedures outlined in ACC policy, facility rulebook and other guidance provided by the facility commander." *Id*. at ¶¶ 2–3.

Exh. 8, at 2.  Two other Board members were present during the Board, along with the Board recorder, U.S. Navy Yeoman (YN2) Jacob Ohl.  *Id*.  The record contains a brief summary of the testimony relevant to the Board's findings.  *Id*.

Petitioner pleaded not guilty to the assault consummated by battery charge.  *Id*. at ¶ 9; Exh. 8.  He claimed during his testimony that he was attacked and was unsure as to why he was charged.  *Id*.  Based on the evidence in the case file, the Board found Petitioner not guilty of assault consummated by battery but guilty of the lesser included offense of disorderly conduct.[4] *Id*.

Under ACC Policy Letter #8, disorderly conduct is "[c]onduct of such a nature as to affect the peace and quiet of individuals, or who may thereby be disturbed or provoked to resentment."  *Id*. at ¶ 11; Exh. 3, ¶ 4.s.  The policy specifically states that disorderly conduct "could encompass all participants in a fight, regardless of who started the fight . . .."  *Id*.  Assault consummated by battery is a Category IV or V offense (depending on the victim).  *Id*.; Exh. 3, ¶ 4.f.  Disorderly conduct is a Category III offense.  *Id*.; Exh. 3, ¶ 4.s.

The Board deliberated on a recommended sentence.[5]  *Id*. at ¶ 12.  Based on Petitioner's prior board history and the circumstances of the charge, the Board recommended only recreation restriction not to exceed twenty-eight days.  *Id*.; Exh. 8, at 1, 3.

---

[4] By regulation, D&A Boards must determine whether an inmate "committed the charged violation or a lesser included offense of the charged violation."  *Id*. at ¶ 10; Exh. 2, USDB *Manual for the Guidance of Inmates* ("MGI") (July 25, 2016), ¶ 6–3.c.(4)(a).  A lesser included offense "must be from the same offense category or a lower offense category and must be an offense clearly similar to that originally charged whose definition and/or elements are derived from the originally charged offense."  *Id*.  "This allows the inmate fair notice and opportunity to prepare a defense to the charge(s) for which accused."  *Id*.

[5] Violations of institutional offenses are divided into five categories of severity with Category I being the lowest and Category V being the highest.  *Id*. at ¶ 12; Exh. 2, ¶ 6–5.a.  The MGI contains the maximum recommended administrative disciplinary and management actions for each category of offenses.  *Id*.; Exh. 2, ¶ 6–5.b.  Disorderly conduct is a Category III offense.  *Id*.; Exh. 3, ¶ 4.s.  Among other things, the MGI authorizes a maximum sentence of forfeiture of 90 days good conduct time, but also authorizes less severe punishments such as a reprimand and forfeiture of 60 days of recreation privileges.  *Id*.; Exh. 2, ¶ 6–5.b.(3)(a)1–7.

On September 24, 2018, the Board's recommendations were approved by the USDB Deputy Commandant, Mr. John Snyder. *Id*. at ¶ 13; Exh. 8, at 1. On September 27, 2018, Petitioner received a copy of the D&A Board results, along with notification that he was not eligible to appeal because his recommended punishment did not include disciplinary segregation, custody reduction, or forfeiture of abatement to confinement. *Id*.; Exh. 8, at 2. Petitioner signed the Board record acknowledging receipt and marked the form indicating his intent to appeal. *Id*.

**B. Petitioner's March 2, 2021 D&A Board**

On October 2, 2020, Petitioner received a disciplinary report and charge sheet for larceny and having prohibited property. *Id*. ¶ 14; Exhs. 9, 10. According to the disciplinary report, Petitioner was observed removing a staff member's black food container with steamed broccoli from a facility refrigerator. *Id*.; Exh. 10. The staff member was working in the control booth and notified another soldier to confiscate the container. *Id*. When Petitioner was confronted by the soldier about the container, he said "Yeah it's mine. It is part of the no pork meal from the DFAC." *Id*. Petitioner was asked by the soldier, "Are you sure?" to which Petitioner responded, "Yeah man, it's mine. The label just fell off right there." *Id*. Petitioner then took the black container back to his cell. *Id*.

Under ACC Policy # 8, larceny is defined as "[t]he taking, obtaining or withholding from the possession of the owner or another without authority, money, property or article of value of any kind." *Id*. at ¶ 15; Exh. 3, ¶ 4.ad. Even items deposited in trash receptacles are considered "owned and in the possession of the government," and retain the same value. *Id*. Further, under policy, "[a]nything not specifically authorized by proper authority to be in a prisoner's possession is prohibited . . . Any item not specifically authorized and found in a prisoner's possession will be considered prohibited property." *Id*.; Exh. 3, ¶ 4.aq.

On October 8, 2020, military police investigator Ashley Faircloth received the disciplinary report and began an investigation. *Id*. at ¶ 16; Exh. 11. According to her report, Investigator Faircloth reviewed the photographic evidence and interviewed Petitioner. *Id*.; Exhs. 11, 12. Investigator Faircloth asked Petitioner if he would like to discuss his disciplinary report for the charges of prohibited property and larceny. *Id*. Petitioner agreed, and Investigator Faircloth advised him of his legal rights. *Id*.; Exhs. 11, 13.

According to Petitioner, on the date in question, he went to retrieve his night time meal but there were no labels on the bags, so he checked every bag to see which bag did not have any meat in it because he was on a "no pork diet." *Id*. at ¶ 17; Exh. 11. Petitioner stated that he found a bag that did not have any meat in it, which was sitting on top of the black container filled with broccoli. *Id*. Petitioner stated that the black container had a "November pod, no pork" sticker on top, and he figured the facility ran out of turkey so he received broccoli instead. *Id*. Petitioner acknowledged that he was approached by a soldier but said the soldier authorized him to return to his cell to eat. *Id*. Petitioner said that another soldier confronted him in his cell after he had made noodles for the broccoli and had begun eating, but that he pointed to the sticker, stated it was his, and the soldier departed. *Id*. Petitioner said the soldier returned to remove the empty container for evidence and informed him he would be written a disciplinary report for larceny. *Id*.

Petitioner told Investigator Faircloth that he had spoken with Sergeant ("SGT") Hoose, the Housing Unit Noncommissioned Officer ("NCO"), who told him that "labels were falling off when he was putting the trays in the fridge for [them]," and Petitioner urged Investigator Faircloth to "please talk to him and verify that because [he] really didn't mean to steal that guard[']s food." *Id*. Investigator Faircloth interviewed SGT Hoose, as well as SGT Kennedy,

the dining facility representative.  *Id*. at ¶ 18.  She confirmed with SGT Hoose that labels were falling off when he put the meals in the refrigerator, and that he did not believe Petitioner had intentionally stolen the staff member's meal.  *Id*.  However, SGT Kennedy informed Investigator Faircloth that the dining facility had never used black plastic containers to provide food to the inmates, and that the directorate was only permitted to order brown paper bags or white Styrofoam containers.  *Id*.  Investigator Faircloth believed that Petitioner was "playing ignorant to the fact that in the past five years the Dining Facility has never used black plastic containers to hand out food to Inmates or staff."  *Id*.  She also noted that when Petitioner was approached about the black plastic container, instead of waiting by the guard's desk to clear the situation up, he "quickly walked back to his cell and ate the food so that it could not be recovered."  *Id*.  Based on the evidence, Investigator Faircloth recommended that Petitioner be charged with the offenses of prohibited property and larceny.  *Id*.

On February 20, 2021, Petitioner was provided a copy of the charges against him.  *Id*. at ¶ 19; Exh. 14.  The first charge was for having prohibited property, and the second charge was for larceny.  *Id*.  Petitioner signed the statement of charges acknowledging that he read the charges and received a copy of the same.  *Id*.  Along with the statement of charges, Petitioner was provided written notification that a three-member D&A Board would be convened to adjudicate the charges against him.  *Id*. at ¶ 20; Exh. 16.  The Board Notification notified Petitioner that he had the right to be present during all open sessions; make a statement and present documentary evidence in his defense; call witnesses to present relevant testimony in his defense; and question adverse witnesses through the Board President.  *Id*.  Petitioner signed the Board notification acknowledging receipt, and requested three witnesses: two staff members, SGT Hoose and Private ("PV2") Dotson, and one inmate, Damon Williams.  *Id*.

Petitioner did not complete the Board notification properly and failed to include the expected testimony of his requested witnesses. *Id*. at ¶ 21; Exh. 16, at 1. By regulation, requested witnesses are generally not produced if the inmate fails to describe their expected testimony. *Id*.; Exh. 2, ¶ 6–3.d.(7). Nevertheless, the Board recorder, YN2 Ohl, submitted a pass for Inmate Williams to attend the D&A Board; he also reached out via email to SGT Hoose and PV2 Dodson to inform them that they had been identified by Petitioner as witnesses for the upcoming D&A Board scheduled for March 2, 2021. *Id*.; Exh. 17, at 2.

While inmates are not provided copies of the underlying evidence, they may review the investigative file and take unlimited notes by submitting a request in advance of their D&A Board. *Id*. at ¶ 22; Exh. 2, ¶ 6-3.c.(2)(b). On February 23, 2021, YN2 Ohl placed Petitioner on pass to review the investigative file. *Id*.; Exh. 18. That same day, Petitioner submitted a request to review the file for a second time based on purported time constraints during his first review. *Id*. On March 1, 2021, the D&A Board President approved Petitioner's request and allowed him to review the file again that day. *Id*. The file included the following:

> MCC Form 67-1, *Charge Sheet* (Oct. 1, 2020) (Exh. 9)
> DD Form 2714, *Prisoner Disciplinary Report* (Oct. 2, 2020) (Exh. 10)
> DA Form 7569, *Investigator Activity Summary* (Nov. 20, 2020) (Exh. 11)
> Photographs of black food container (Exh. 12)
> DA Form 3881, *Rights Warning Procedure/Waiver Certificate* (Oct. 8, 2020) (Exh. 13)

*Id*.; Exhs. 9–13. Petitioner was authorized to take unlimited notes of the file on both occasions. *Id*.

On March 2, 2021, the three-member D&A Board convened and conducted a hearing into the charges. *Id*. at ¶ 23; Exh. 17. Petitioner was present for the hearing; informed of the alleged misconduct; sworn under oath; made aware of his rights; informed of his right to question relevant witnesses; and given the opportunity to present evidence in his defense. *Id*.; Exh. 17, at

2.  Two other Board members were present during the Board, along with the Board recorder, YN2 Ohl.  *Id*.; Exh. 17, at 1.  The record contains a summary of the testimony relevant to the Board's findings.  *Id*.; Exh. 17, at 3–4.

Petitioner pleaded not guilty to both charges.  *Id*. at ¶ 24; Exh. 17.  Prior to the D&A Board, Petitioner prepared a typed, written statement in his defense, which he was allowed to read to the Board and submit into evidence at the hearing.  *Id*.; Exhs. 17, 19.  Petitioner maintained his version of the events.  *Id*.; Exh. 17, at 3–4.  The Board questioned Petitioner about whether he had ever received cooked vegetables as a meal substitute, and whether he had ever received food from the dining facility in a black container.  *Id*.  Petitioner admitted that he never received any food in a black container, and claimed he was unaware that the broccoli was cooked—despite opening the container and later placing the broccoli into a cup of noodles.  *Id*.  The Board also questioned Petitioner about his response to the situation once he was told that he had a staff member's food.  *Id*.

Inmate Williams also testified at the D&A Board.  *Id*. at ¶ 25; Exh. 17.  Neither SGT Hoose nor PV2 Dodson responded to YN2 Ohl by the date of the Board, so the Board President directed YN2 Ohl to contact "central control" to determine if they were present in the facility.  *Id*.  Central control reported that neither soldier was present or available.  *Id*.  The Board President informed Petitioner that SGT Hoose and PV2 Dodson were not reasonably available and asked what he anticipated their testimony would be.  *Id*.  Petitioner expected them to testify that stickers were falling off the meal bags prior to being placed in the refrigerator, and that Petitioner was on his current detail for five months without having stolen anything.  *Id*.

The Board President noted that Investigator Faircloth's report corroborated SGT Hoose's expected testimony regarding the stickers.  *Id*. at ¶ 26; Exh. 11.  Further, Petitioner's disciplinary

record did not reflect any previous larcenies.  *Id*.  As a result, the Board President determined that SGT Hoose and PV2 Dodson were not reasonably available and that their testimony would constitute unnecessary duplication of the issues before the Board.[6]  *Id*.  In her view, "[w]hile either of the two witnesses' testimony regard [sic] Petitioner's lack of previous larcenies would constitute character evidence, [she] gave Petitioner the benefit of the doubt."  *Id*.  Thus, she informed Petitioner that the Board would be taking SGT Hoose's and PV2 Dodson's proffered testimony into consideration, including the fact that Petitioner had been on detail for five months without any similar offenses.  *Id*.; Exh. 17, at 2, 4.

The Board deliberated in a closed session and considered each charge.  *Id*. at ¶ 27.  Based on Petitioner's testimony and the preponderance of evidence, the Board dismissed the larceny charge but found Petitioner guilty of having prohibited property.  *Id*.; Exh. 17, at 3.  The Board also deliberated on a recommended sentence.[7]  *Id*.  Based on Petitioner's prior board history and the circumstances of the charge, the Board recommended only a reprimand and recreation restriction not to exceed thirty days.  *Id*.; Exh. 17, at 1.

On March 10, 2021, the D&A Board recommendations were approved by the USDB Deputy Commandant, Mr. John Snyder.  *Id*. at ¶ 28; Exh. 17, at 1.  On March 16, 2021, Petitioner received a copy of the Board results, along with notification that he was not eligible to appeal because his recommended punishment did not include disciplinary segregation, custody reduction, or forfeiture of abatement to confinement.  *Id*.; Exh. 17, at 2.  Petitioner signed the Board record acknowledging receipt and marked the form indicating his intent to appeal.  *Id*.

---

[6] By regulation, the right to call witnesses is not absolute and may be denied if, in the view of the Board President, they are not reasonably available, irrelevant, or would constitute unnecessary duplication of issues before the Board. *Id*. at ¶ 26; Exh. 1, ¶ 12–13.a.(3)(d); Exh. 2, ¶ 6–3.d.(4).  Further, only those witnesses who observed the incident can offer testimony in defense or mitigation of the charges, or witnesses who can clarify issues surrounding the charges; character witnesses are not allowed.  *Id*.; Exh. 2, ¶ 6–3.d.(7).

[7] Prohibited property is a Category III offense.  *Id*. at ¶ 27; Exh. 3, ¶ 4.aq.  Among other things, the MGI authorizes a maximum sentence of forfeiture of 90 days good conduct time, but also authorizes less severe punishments such as a reprimand and forfeiture of 60 days of recreation privileges.  *Id*.; Exh. 2, ¶ 6–5.b.(3)(a)1–7.

### III. Discussion

#### 1. Standard of Review

To obtain habeas corpus relief, an inmate must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal prisoner has a constitutionally protected liberty interest in his earned Good Conduct Time ("GCT"). *See Brown v. Smith*, 828 F.2d 1493, 1494 (10th Cir. 1987). Therefore, a petitioner is entitled to due process at a disciplinary hearing that resulted in the loss of GCT. *Howard v. Bureau of Prisons*, 487 F.3d 808, 811 (10th Cir. 2007). However, because prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so," the "full panoply of rights due a defendant in [criminal] proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556, 561 (1974); *see also Abdulhaseeb v. Ward*, 173 F. App'x 658, 661 (10th Cir. 2006).

In *Wolff*, the Supreme Court held that in order to satisfy due process in a prison disciplinary proceeding, the inmate must receive: (1) "advance written notice of the claimed violation" no less than 24 hours prior to the hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals;" and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action." *Wolff*, 418 U.S. at 563–66 (citations omitted); *see also Abdulhaseeb*, 173 F. App'x at 661 (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)); *Smith v. Maschner*, 899 F.2d 940, 946 (10th Cir. 1990). Additionally, there must be some evidence to support the decision and the

decisionmaker must be impartial.  *Gwinn v. Awmiller*, 354 F.3d 1211, 1219 (10th Cir. 2004) (citing *Wolff*, 418 U.S. at 592) (Marshall, J., concurring)).

### 2. Protected Liberty Interest

Petitioner alleges that his due process rights were violated during his two disciplinary proceedings.  Therefore, the Court must determine whether or not Petitioner's disciplinary proceedings implicated a protected liberty interest.

Petitioner alleges that after his September 17, 2018 D&A Board, he was reduced in custody, sent to the Segregate Housing Unit ("SHU") for about 8 months, and was made to ship or destroy items such as books, shoes, and a fan at his expense.  (Doc. 9, at 3.)  Petitioner further alleges that on the date of his second D&A Board—March 8, 2021—he was considered a Minimum Inside Only (MIO) and following the Board proceeding Petitioner's custody was reduced two levels to classify Petitioner as a Maximum (MAX) custody inmate.  Petitioner alleges that this subjected him to the forfeiture of property allowed only at the MIO level or higher, e.g. access to a word processor, an MP3 Player, and access to "broader Ration for purchase list."  *Id*.  Petitioner alleges that he was placed on MAX custody for around two months where he was on solitary confinement, 23-hour lockdown, one-hour recreation in a cage and limited access to the law library and other inmates.  *Id*.

Petitioner also maintains that "[t]he Army Clemency and Parole Board has made it clear that they consider it very important for inmates to maintain good conduct during confinement if parole is their goal" and "they state that poor behavior would adversely impact the length in which an inmate may stay confi[n]ed."  *Id*. at 8.  Petitioner states that he suffered the loss of "one good year for each disciplinary board conviction."  *Id*. at 9.  Petitioner alleges that Respondent

knows that when "he approves a finding of a 3-man board the inmate is subject to automatic forfeitures of his good year credit." *Id.*

The Due Process Clause protects against "deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Although the guarantee against deprivations of liberty without due process of law applies to prison inmates, "prisoners' due process rights are defined more narrowly." *Marshall v. Morton*, 421 F. App'x 832, 837 (10th Cir. 2011) (unpublished) (quoting *Wilson v. Jones*, 430 F.3d 1113, 1117 (10th Cir. 2005)). In the prison context, liberty interests which are protected by the Due Process Clause are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

In *Marshall*, the Tenth Circuit held that the court need not address the procedural deficiencies asserted or evaluate whether Marshall received adequate procedural due process because the court concluded that Marshall's disciplinary proceedings did not implicate a protected liberty interest. *Marshall*, 421 F. App'x at 837. Marshall contended that his disciplinary proceedings implicated a protected liberty interest because: "(1) his inmate classification level was reduced from level two to level one; (2) his misconduct conviction could negatively affect his parole consideration; and (3) ODOC policies and procedures were not followed." *Id.*

Marshall argued that the reduction to his classification level affected not only the number of earned credits an inmate receives, but also an inmate's eligibility for "numerous other things."

*Id*.  Specifically, he alleged "that the change to an inmate's classification level reduces the amount of monthly income he receives and results in the loss of an assortment of privileges." *Id*. at 837–38.  The court rejected this argument, finding that although "a mandatory reduction in the rate at which a prisoner earns good time credits based on a misconduct conviction implicates a prisoner's protected liberty interest by 'inevitably affecting the duration of his sentence'[,]" in Marshall's case he was ineligible to receive earned credits. *Id*. at 838 (citations omitted).

The court further held that Marshall's loss of privileges did not impose "atypical and significant harship[s] on [him] in relation to the ordinary incidents of prison life." *Id*. (quoting *Sandin*, 515 U.S. at 484).  "Specifically, restrictions on an inmate's telephone use, property possession, visitation and recreation privileges are not different in such degree and duration as compared with the ordinary incidents of prison life to constitute protected liberty interests under the Due Process Clause." *Id*. (also stating that prisoners do not have a protected liberty interest in prison employment).

The court also held that "the possibility that Marshall's misconduct conviction could have a negative impact on his parole consideration did not implicate a protected liberty interest[,]" because "[t]he decision to release a prisoner rests on a myriad of considerations." *Id*. (quoting *Sandin*, 515 U.S. at 487).  The chance that consideration of an inmate's misconduct conviction when deciding whether to grant parole "will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id*. (quoting *Sandin*, 515 U.S. at 487).

Lastly, the court held that Marshall's allegations that the ODOC failed to follow policies and procedures failed to allege sufficient facts to show that the deviations "imposed atypical and significant hardships on him in relation to the ordinary incidents of prison life or inevitably affected the duration of his sentence." *Id*.

In *Barela v. Wyoming Department of Corrections*, the Tenth Circuit held that a liberty interest could not be inferred "from the loss of time for recreation or television, placement in restricted housing, or prejudice to the bid for commutation." *Barela v. Wyoming Dep't of Corr.*, 830 F. App'x 252, 254 (10th Cir. 2020) (unpublished).  The court held that the temporary loss of television (15 days) and recreation privileges (45 days) are common sanctions in prisons, "so they couldn't possibly trigger a liberty interest." *Id*. (citations omitted).

Petitioner has failed to allege sufficient facts to show a protected liberty interest.  He has not shown that he was subjected to atypical and significant hardships in relation to the ordinary incidents of prison life. *See Grady v. Garcia*, 506 F. App'x 812, 814 (10th Cir. 2013) (unpublished) (rejecting due process claim because temporary (105 days) conditions of confinement—no television and radio in cell and loss of canteen privileges and recreation time with general prison population—did not constitute an "atypical and significant" hardship when compared to the ordinary incidents of prison life) (citation omitted)).  Although Petitioner asserts that Respondent knows that when "he approves a finding of a 3-man board the inmate is subject to automatic forfeitures of his good year credit," he does not allege that he was actually deprived of good time credits or that the duration of his custody was actually affected.  Petitioner does not explain what a "good year credit" is and it is unclear whether it affects parole considerations or somehow translates into the loss of credit toward a sentence.

Although Petitioner presents no evidence that he was denied good conduct time, the record reflects that Petitioner's disciplinary proceedings did not provide for a sanction of loss of good conduct time.  Petitioner was not entitled to appeal his D&A Board decisions based on the sanctions imposed.  The OCJA responded to Petitioner's attempt to appeal his March 2021 D&A Board decision by stating that:  "[y]ou may appeal a D&A Board conviction approved by the

Deputy Commandant resulting in DS, custody reduction, or forfeited GCT, ET or SAA."

Stephen Harms, Deputy Command Judge Advocate, declared that:

> Among other things, the USDB Commandant is the Army's final appellate authority for D&A Boards resulting in disciplinary segregation, custody reduction, and forfeitures of good-conduct time and earned time abatement.  By regulation, inmates are not entitled to appeal D&A Boards with less severe punishments, such as reprimands or warnings, extra duty, or deprivation of privileges.  D&A Boards with such sentences are final and not subject to appeal. . . . [Petitioner's first D&A] Board recommended a punishment of "Recreation Restriction [not to exceed] 28 days."  On September 24, 2018, the Board's recommendation was approved by the USDB Deputy Commandant. . . Petitioner was not entitled by regulation to appeal his D&A Board. . . . [Petitioner's second D&A] Board recommended a punishment of "Reprimand" and "Recreation Restriction [not to exceed] 30 days."  On March 10, 2021, the Board's recommendation was approved by the USDB Deputy Commandant.  . . . Petitioner was not entitled to appeal based on the recommended punishment.

Harms Decl. at ¶¶ 4–8; *see also* Gessner Decl. at ¶ 12 (stating the Petitioner's first D&A Board "recommended only recreation restriction not to exceed 28 days), and ¶ 27 (stating that Petitioner's second D&A Board "recommended only a reprimand and recreation restriction not to exceed 30 days");  Gessner Decl. Exh. 4, Inmate Disciplinary Report (providing that the recommendation of the D&A Board was "Recreation Restriction NTE 28 Days" and leaving blank the section for "GCT/EGCT Forfeited"); Gessner Decl. Exh. 8, Discipline and Adjustment Board Record (providing that the Recommended Disciplinary Action(s) is "RECREATION RESTRICTION NTE 28 DAYS"); Gessner Decl. Exh. 10, Prisoner Disciplinary Report/Action (showing the D&A Boards recommendation as "REPRIMAND" and "RECREATION RESTRICTION NTE 30 DAYS"; Gessner Decl. Exh. 17, Discipline and Adjustment Board Record (showing the recommended disciplinary action as "REPRIMAND, RECREATION RESTRICTION NTE 30 DAYS" and under the heading GCT/EGCT Forfeited providing "0/0"); Doc. 9–2, at 7 (Petitioner's Inmate Request Slip stating that his March 2, 2021 Board subjected

him to:  6 Disciplinary Points; 8 High Risk Points; Reduction in Custody from MIO; 30 days Rec

Restriction; and 30 days Max Custody); and Doc. 9–2, at 25, Inmate Request Slip (reply stating

that "you are not able to appeal . . . the type of punishment you received is not appealable").

Petitioner also alleges that he was forced to either discard or ship property that he was

prohibited from possessing due to his restricted housing placement.  The court in *Barela* noted

that although the petitioner contended that some of his property was lost, "the disciplinary

proceedings didn't lead to an order depriving Mr. Barela of any property" and "[a]ny loss of

property would have resulted only indirectly from the disciplinary proceedings."  *Id*. at n.1.

### 3.  Due Process

Even assuming Petitioner could establish a protected liberty interest, he still must show

that he was denied due process at his two D&A Boards.  "Where a liberty or property interest has

been infringed, the process which is due under the United States Constitution is that measured by

the due process clause, not prison regulations."  *Brown v. Rios*, 196 F. App'x 681, 683 (10th Cir.

2006) (unpublished) (citations omitted); *see also Sandin*, 515 U.S. at 481–82 (stating that prison

regulations are "not designed to confer rights on inmates" and are "designed to guide

correctional officials in the administration of a prison").

Petitioner alleges in Grounds One and Two that he was denied due process because he

was found guilty of a lesser included offense—disorderly conduct—at his September 17, 2018

D&A Board without receiving prior written notice of the lesser included offense.  Petitioner

alleges that he was denied proper notice and the ability to prepare a defense to the lesser included

offense in violation of *Wolff*.

"When a prisoner is convicted of a lesser included offense based on factual allegations

contained in the original charging instrument, his due process right of advance notice has been

18

satisfied." *Walls v. Dretke*, Civil Action No. H-05-3680, 2006 WL 1715770, at *12 (S.D. Tex. June 20, 2006) (citing *Northern v. Hanks*, 326 F.3d 909, 910–11 (7th Cir. 2003) (prison disciplinary proceeding did not violate inmate's due process rights where he was given advance notice of the original charge and it contained facts sufficient to apprise him that he could be subject to the modified charge); *see also Holt v. Caspari*, 961 F.2d 1370, 1373 (8th Cir. 1992) ("prison disciplinary committee did not deny petitioner due process by elevating charge from 'possession of contraband' to 'possession of dangerous contraband' because the factual basis for both charges was the same"); *Walters v. Gonzalez*, Civil Action No. 2:15-CV-57, 2016 WL 704967, at *2 (S.D. Tex. Feb. 23, 2016) (finding that where both charges related to the exact same conduct, notice on the original charge was sufficient for lesser included offence, and stating that "notice must be directed to the conduct at issue—the date, time, and event alleged to be a violation of the rules" and that what's important "is that the prisoner have notice of the facts upon which the claim is based"); *Jones v. Virga*, No. 2:12-cv-1138, 2013 WL 6383248, at *11 (E.D. Cal. Dec. 5, 2013) ("There is no due process violation for failure to give notice of a lesser included offense.") (citations omitted); *Gomez v. Moten*, 20 F.3d 467, 1994 WL 122104, at *1 (5th Cir. March 24, 1994) (finding that "[t]he purpose of notice is to enable the prisoner to prepare a defense" and "[a]s the facts are the same for both offenses and one is a lesser included offense of the other, the purpose of notice was satisfied"); *Cabbagestalk v. Cartledge*, Civil Action No. 3:12-3182-SB, 2013 WL 5409204, at *3 (D. S.C. Sept. 25, 2013) (finding no due process violation where charge was reduced to a lesser-included offense without 24 hours of notice); *see also Goertz v. Chrisman*, 722 F. App'x 842, 845 (10th Cir. 2018) (unpublished) ("A defendant charged with an offense has sufficient notice that he may have to defend against any lesser-included offense.") (citation omitted).

Petitioner received written notice of the charge for assault consummated by battery, and has not disputed that disorderly conduct is a lesser included offense.  *See* Harms. Decl., Exh. 1, at 14.  He received notice of the date, time, and event alleged to be a violation of the rules, and the facts are the same for both offenses.  Petitioner received sufficient notice to satisfy due process.

Petitioner alleges in Ground Three that he was denied due process at his March 2, 2021 D&A Board because he was not allowed to call his key witness—SGT Hoose.  Petitioner alleges that despite being told that SGT Hoose was unavailable, Petitioner "noticed that SGT Hoose was present at work on the day of the discipline and adjustment board" and SGT Hoose had previously told Petitioner days before that he would be at the D&A Board.  (Doc. 7, at 13–14.)

"[W]hile an inmate generally has the right to call witnesses and present evidence, such right is not absolute; the prison can restrict witness testimony and documentary evidence due to special requirements of the prison setting."  *Diaz v. McGuire*, 154 F. App'x 81, 84 (10th Cir. 2005) (unpublished) (citations omitted).  In *Diaz*, the Tenth Circuit found that "the disciplinary boards documented their reasons, on a case-by-case basis, for not hearing all of Mr. Diaz's requested witnesses, and the reasons given (redundancy, relevancy, and duplication) were within the permissible discretion of prison officials."  *Id*. (citation omitted).  Likewise, the absence of two of Petitioner's requested witnesses did not actually or effectively deprive him of any defense and he was not deprived of due process.  *Id*.

One of Petitioner's witnesses testified at the Board, and an attempt was made to locate the other two witnesses.  The Board President allowed Petitioner to state the witnesses' anticipated testimony and found that it was consistent with evidence already before the Board. The Supreme Court in *Wolff* cautions that courts "should not be too ready to exercise oversight

and put aside the judgment of prison administrators" and "must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required." *Wolff*, 418 U.S. at 566.

Petitioner contends as Ground Four that he was not allowed to have copies of the evidence that would be used against him at his March 2, 2021 D&A Board, and he had to hand write sections of the investigation summary to prepare his defense.  Petitioner claims that ten minutes was not enough time to take notes and prepare.  Petitioner claims that he was not allowed to have copies, but was told to obtain copies through a FOIA request instead.  (Doc. 7, at 15.)    Petitioner alleges that he did not have copies of the evidence in time to consult with an attorney.  (Doc. 7, at 7.)   He claims that he requested a consultation with his attorneys on February 25, 2021, but was not scheduled to talk to either counsel until March 2nd and 9th, 2021. (Doc. 9, at 13.)   Both consultations were scheduled to take place after the D&A Board. *Id*.

Petitioner was allowed to have a second opportunity to review the file after he made a request.  Petitioner did not request a continuance of his D&A Board to allow him additional time to review the evidence or to consult with counsel.  Petitioner has not alleged a constitutional right to have copies of his file and *Wolff* does not set forth such a requirement.  *See Wilson v. Fikes*, Case No. 21-cv-367 (PAM/HB), 2021 WL 2582259, at *3 (D. Minn. May 18, 2021), *adopted by* 2021 WL 2582199 (D. Minn. June  23, 2021) (stating that "the Supreme Court has made it clear that due process is satisfied when a petitioner receives advance *notice* of the disciplinary charges against him and a *description* of the evidence to be relied upon" and "[n]othing in *Hill* or *Wolff*, or in any other case this Court has found, suggests that he is entitled

to receive copies of the evidence itself in advance of the hearing") (citing *Hill*, 472 U.S. at 454; *Wolff*, 418 U.S. at 564–65).  Petitioner has not shown a due process violation in Ground Four.

Even if Petitioner could establish a protected liberty interest, the record demonstrates that Petitioner received due process at his two D&A Boards.  Both proceedings met the standards set forth in *Wolff* and *Hill*.

### 4. Improper Claims and Requests for Relief

Petitioner's request for relief in his Petition sought to have the recommendations of the Boards set aside and to have any references to the charges expunged from his CTF.  (Doc. 1, at 7; Doc. 7, at 7, 15.)  Petitioner raises additional claims and seeks additional relief in his response and traverse.  *See* Doc. 7, at 17 (alleging that Respondent intended to engage in activities which would obstruct Petitioner's legal documents from reaching the Court and denied Petitioner his First Amendment rights).  Petitioner alleges that staff at the USDB have failed to reimburse him for the filing fee that was not received by the Court.  *Id*.  Petitioner alleges that he has been denied his First Amendment right to court access and "inmates" have been subjected to retaliation.  (Doc. 9, at 4–5.)   In his traverse, Petitioner seeks declaratory relief, compensatory damages, punitive damages, and injunctive relief.  *Id*. at 15–16.

Any claims Petitioner has for retaliation or violations of his First Amendment rights, as well as his requests for relief, are not properly brought in a habeas action.  The Tenth Circuit in *Barela* held that "[t]he remedy of habeas corpus ordinarily serves to require release from illegal confinement, attack future confinement, or shorten the existing confinement."  *Barela*, 830 F. App'x at 255 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973) (release from present confinement or attack future confinement); *Palma-Salazar v. Davis*, 677 F.3d 1031, 1035 (10th Cir. 2012) (shorten confinement)).   Thus, where Mr. Barela "requested expungement of his

disciplinary convictions, return of his personal property, reinstatement to his prior position in the dog program, different housing, prison employment, compensatory damages, and punitive damages" the court held that "[t]hese are remedies available in a civil rights suit but not in a habeas action." *Id*. at 255–56, and n.3 (also noting that like a change in housing, reinstatement in the dog program and prison employment involve only changes in conditions of confinement, not the duration of confinement) (citing *Preiser*, 411 U.S. at 494 (concluding that damages are available in civil rights suits, not habeas actions); *Davis v. Fox*, 701 F. App'x 715, 716 (10th Cir. 2017) (unpublished) (concluding that a claim for retaliatory impoundment of personal property cannot be brought in a habeas petition); *Palma-Salazar*, 677 F.3d at 1035–36 (concluding that habeas relief was unavailable to obtain a change in prisoner housing)). The court found that while expungement could conceivably boost petitioner's chances for a discretionary remedy like commutation or parole, "these remedies are discretionary" and therefore expungement is not an available remedy in a habeas action because it "wouldn't necessarily quicken Mr. Barela's release." *Id*. at 256.

The Court finds that Petitioner's requests for relief and claims relating to his conditions of confinement are not properly brought in this habeas action. Claims challenging a prisoner's conditions of confinement do not arise under Section 2241. *See McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997) (contrasting suits under Section 2241 and conditions of confinement claims). The Court finds that these claims are not properly before the Court. The Court offers no opinion on the merits of such an action. *See Feres v. United States*, 340 U.S. 135 (1950) (determining that the Federal Torts Claims Act did not operate as a waiver of sovereign immunity in an action brought by active-duty military personnel); *Chappell v. Wallace*, 462 U.S. 296, 305 (1983) (applying the *Feres* doctrine to bar constitutional claims

brought pursuant to *Bivens*, holding "that enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations"); *Rios v. Commandant*, 100 F. App'x 706, n.1 (10th Cir. 2004) (unpublished) (noting that the court has held that "[a military prisoner's] claims for injunctive and declaratory relief [were] not barred by the *Feres* doctrine.") (quoting *Walden v. Bartlett*, 840 F.2d 771, 774 (10th Cir. 1988)).

### 5. Conclusion

The Court finds that Petitioner has failed to show that his disciplinary proceedings implicated a protected liberty interest or that he was denied due process. Petitioner has also asserted claims and requests for relief that are not properly brought in a petition for writ of habeas corpus.

**IT IS THEREFORE ORDERED BY THE COURT** that the petition for writ of habeas corpus is **denied**.

**IT IS SO ORDERED**.

**Dated August 20, 2021, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**